UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT KNOXVILLE


| DAVID E. CROZIER | ) | |
| --- | --- | --- |
| | ) | |
| Petitioner, | ) | |
| | ) | |
| v. | ) | 3:03-cv-116 |
| | ) | 3:97-cr-154 |
| | ) | *Jarvis* |
| | ) | |
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| Respondent. | ) | |

## **MEMORANDUM OPINION**

This is a motion to vacate, set aside or correct sentence pursuant to 28 U.S.C. § 2255. For the following reasons, the § 2255 motion will be **DENIED** and this action will be **DISMISSED**. All other pending motions will be **DENIED** as **MOOT**.


I. Standard of Review

This court must vacate and set aside petitioner's conviction upon a finding that "there has been such a denial or infringement of the constitutional rights of the prisoner as to render the judgment vulnerable to collateral attack." 28 U.S.C. § 2255. To prevail under § 2255, petitioner "must show a 'fundamental defect which inherently results in a complete miscarriage of justice,' or, an error so egregious that it amounts to a violation of due process."

*United States v. Ferguson*, 918 F.2d 627, 630 (6th Cir. 1990) (quoting *Hill v. United States*, 368 U.S. 424, 428 (1968)).

Under Rule 8 of the Rules Governing Section 2255 Proceedings In The United States District Courts, the court is to determine after a review of the answer and the records of the case whether an evidentiary hearing is required. If the motion to vacate, the answer and the records of the case show conclusively that petitioner is not entitled to relief under § 2255, there is no need for an evidentiary hearing. *Baker v. United States*, 781 F.2d 85, 92 (6th Cir. 1986).

II. <u>Factual Background</u>

Petitioner and co-defendant, Charles W. Burton, were charged, in a nine-count second superseding indictment, of the following: conspiracy to distribute and possess with intent to distribute various controlled substances (count one); armed robbery of a pharmacy (count two); using and carrying a firearm during and in relation to a crime of violence (count three); being a felon in possession of a firearm (count four referred to Burton and count five referred to petitioner); possession with intent to distribute Schedule II controlled substances (count six); possession with intent to distribute a Schedule III controlled substance (count seven); possession with intent to distribute a Schedule IV controlled substance (count eight); and using and carrying a firearm during and in relation to a drug trafficking crime (count nine). [Criminal Action No. 3:97-cr-154, Court File No. 71, Second Superseding Indictment].

2

Following a bench trial, petitioner was found guilty of the drug conspiracy and was acquitted on all other charges. Petitioner was sentenced as a career offender to a term of imprisonment of 215 months. His conviction was affirmed on direct appeal. *United States v. Crozier*, 259 F.3d 503 (6th Cir. 2001), *cert. denied*, 534 U.S. 1149 (2002).

On direct appeal, petitioner argued that the evidence was not sufficient to support a conviction on the conspiracy charge. The Sixth Circuit first summarized the evidence, with reference to discrete criminal activities, as follows:

> 1. The Tennessee Rite-Aid Robbery
>
> On November 26, 1995, two armed gunmen robbed the Rite-Aid Drug Store in Clinton, Tennessee, and absconded with numerous pharmaceutical drugs, including Schedule II, Schedule III, and Schedule IV controlled substances. During the robbery, one of the robbers (later identified as Burton) repeatedly asked Katrina DeBusk, the Rite-Aid pharmacist, about the location of several drugs, including Dilaudid pills and morphine. Several days after the robbery, DeBusk helped police prepare a composite sketch of the first suspect in about fifteen minutes. Police worked on a composite of the second suspect (again, later identified as Burton) for approximately three hours but failed to produce a sketch satisfactory to DeBusk.
>
> Approximately one month later, DeBusk and Shelly Simonds, the only other Rite-Aid employee present during the robbery, separately identified Burton as one of the robbers from a photographic line-up. The Clinton Police Department, which uses black-and-white mug shots, had obtained Burton's photograph from the Lexington, Kentucky, Police Department, which uses color mug shots. Accordingly, Burton's photograph was the only color photograph shown to the witnesses. On March 6, 1998, both witnesses again identified Burton as the perpetrator, this time from a live line-up. Burton was the only person represented in both the photo line-up and the live line-up.
>
> Although neither witness was able to identify Crozier as Burton's accomplice during the robbery, Crozier's brother-in-law, Richard Randolph, testified at trial that in early December, Crozier showed him a bag containing

3

bottles of pharmaceutical drugs and told him that Crozier and Burton had obtained the drugs by robbing a Tennessee drugstore.

2. The Kentucky Drug Sales

In late November or early December 1995, in Lexington, Kentucky, Clayton Hobbs arranged for Burton to sell some drugs to Christopher Tucker. Hobbs drove Burton and an unidentified third man in a small car to Tucker's shop where Burton sold Tucker two boxes of pharmaceutical drugs. Tucker gave Burton $1,800 in one-hundred dollar bills. Tucker was unable to identify Crozier as the third man.

The next day, as previously agreed, Burton and Hobbs returned to Tucker's shop, where Tucker gave Burton an additional one thousand dollars in one-hundred dollar bills. Tucker testified that this time, Burton and Hobbs were in a Cadillac Eldorado. On December 1, Burton paid six hundred dollars cash to a pawn shop for his previously-pawned Cadillac Eldorado. The United States thus argues that although Tucker could not recall the exact date of the drug sale, the drugs must have been sold on November 30, with the follow-up payment occurring on December 1.

3. Casing the Lexington, Kentucky, Rite-Aid

At approximately 4 p.m. on December 1, security personnel for the Rite-Aid Drug Store in Lexington observed Burton and Crozier enter the store together, walk around separately, and eventually meet up at the pharmacy. Burton made a purchase and left the store, only to return a short time later, stay awhile, then leave. Burton again returned and after fifteen or twenty minutes, met up with Crozier. The two split up again, ultimately leaving the store separately. A short while later, Burton again returned, and spent approximately five minutes paying particular attention to the cash registers' and employees' locations. Crozier also re-entered the store but remained near the front. Burton finally ended this episode by placing a Tylenol bottle in his pocket. When confronted by security, a fight ensued, resulting in Burton's arrest and Crozier fleeing the scene. Police found syringes, $1,557 in cash (including fifteen one-hundred dollar bills), and a number of Dilaudid pills on Burton. Shortly after Burton's arrest, his girlfriend pawned two handguns, one of which matched the description DeBusk had given of the gun she saw during the Tennessee Rite-Aid robbery.

On December 6, police officers executed a parole violation warrant on Burton. It was while Burton was being held on that charge that the Lexington Police Department forwarded Burton's color mug shot to the Clinton Police Department in Tennessee. Burton remained incarcerated for parole violations for the remaining time relevant to this appeal.

4. The Somerset, Kentucky, Drugstore Burglary

On February 8, 1996, Randolph and Crozier's son, Brett, burglarized a Somerset, Kentucky, drugstore and brought the drugs to Crozier. Some of those drugs were then taken to Clayton Hobbs, while Crozier, Randolph, and a man named Charlie Henderson sold the morphine obtained in the burglary to someone in Georgetown, Kentucky, for one thousand dollars.

During the time relevant to this appeal, Crozier was living on Limestone Street in Somerset, while Crozier's wife lived on White Street. Although Crozier often visited and occasionally stayed overnight at his wife's home, he maintained his own residence. On February 12, police officers executed search warrants at both the Limestone Street and White Street residences. The search of Crozier's Limestone Street residence revealed one bottle of pharmaceutical drugs and a ledger reflecting indebtedness to Crozier by Burton for one thousand dollars, and by "Clayton" for eight hundred dollars. The search of Crozier's wife's White Street residence revealed two bags containing a large number of pharmaceutical drugs in wholesale-sized bottles, and eight-hundred forty-five dollars in Crozier's wallet. Some of those bottles were traceable to the Somerset drugstore and others were consistent with drugs taken during the Tennessee Rite-Aid robbery. Although Crozier was present at the White Street address during the search, Crozier's fingerprints were not found on any of the seized booty.

*Id*. at 507-09.

The Sixth Circuit then concluded the evidence was sufficient to support the convictions:

The United States presented the following facts as evidence that Crozier and Burton were involved in a drug conspiracy: 1) Crozier and Burton asked their parole officer for permission to work together; 2) Crozier and Burton were caught on security tape casing the Kentucky Rite-Aid; 3) a ledger was found in Crozier's house reflecting that Burton owed him one thousand

5

> dollars, and that "Clayton" (presumably Clayton Hobbs) owed him eight hundred dollars; 4) a large quantity of pharmaceutical drugs in wholesale bottles, consistent with some of the drugs taken during the Tennessee Rite-Aid robbery, were found in Crozier's wife's house; and 5) Richard Randolph, Crozier's brother-in-law, testified that Crozier told him that Crozier and Burton had obtained a number of pharmaceutical drugs during a Tennessee drugstore robbery. This evidence, though all of it circumstantial, was sufficient to allow the district court to find that Crozier was guilty of conspiracy beyond a reasonable doubt.

*Id*. at 517-18.

In support of his § 2255 motion to vacate sentence, petitioner alleges numerous instances of ineffective assistance of counsel. He also alleges that the government withheld evidence, in violation of its obligations under *Brady v. Maryland*, 373 U.S. 83 (1963) and *Giglio v. United States*, 405 U.S. 150 (1972), and that the court erred in sentencing him as a career offender.

III. <u>Discussion</u>

*A. Ineffective Assistance of Counsel*

In *Strickland v. Washington*, 466 U.S. 668 (1984) the United States Supreme Court established a two-part standard for evaluating claims of ineffective assistance of counsel:

> First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance

> prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.

*Id*. at 687.

To establish that his attorney was not performing "within the range of competence demanded of attorneys in criminal cases," *McMann v. Richardson*, 397 U.S. 759, 771 (1970), petitioner must demonstrate that the attorney's representation "fell below an objective standard of reasonableness." *Strickland v. Washington*, 466 U.S. at 687-88. In judging an attorney's conduct, a court should consider all the circumstances and facts of the particular case. *Id*. at 690. Additionally, "a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'" *Id*. at 689 (quoting *Michel v. Louisiana*, 350 U.S. 91, 101 (1955)).

The issue is whether counsel's performance "was so *manifestly* ineffective that defeat was snatched from the hands of probable victory." *United States v. Morrow*, 977 F.2d 222, 229 (6th Cir. 1992) (*en banc*). Because he is seeking relief under § 2255, petitioner bears the burden of proving by a preponderance of the evidence that his counsel was deficient. *See Pough v. United States*, 442 F.3d 959, 964 (6th Cir. 2006). As noted, petitioner alleges several instances of ineffective assistance of counsel, each of which the court will consider in turn.

**1. Failure to argue petitioner's innocence as to count one.**

Petitioner claims he is factually innocent of the drug conspiracy and that both his trial attorney and his attorney on direct appeal failed to argue his innocence. Petitioner goes on, however, to challenge the sufficiency of the evidence against him. On direct appeal, the Sixth Circuit considered and rejected petitioner's claim that the evidence was not sufficient to convict him of conspiracy. *United States v. Crozier*, 259 F.3d at 517-18. Petitioner cannot use a § 2255 proceeding to relitigate issues decided adversely to him on direct appeal. *See, e.g., DuPont v. United States*, 76 F.3d 108, 110 (6th Cir. 1996). Accordingly, this claim lacks merit.


**2. Failure to raise the Brady and Giglio claims, and the claimed sentencing error.**

Petitioner alleges his attorneys failed to raise these claims. Elsewhere in this opinion, however, the court has found these claims lack merit. [Section III., B., pp. 15-18, and C., p. 18, respectively, *infra*]. The failure of defense counsel to pursue frivolous motions and objections cannot constitute ineffective assistance of counsel. *United States v. Hanley*, 906 F.2d 1116, 1121 (6th Cir. 1990). Likewise, an attorney is not required to raise meritless issues on appeal. *Mathews v. United States*, 11 F.3d 583, 585 (6th Cir. 1993). According, petitioner has failed to state a claim of ineffective assistance of counsel in this regard.

**3. Failure to conduct an investigation or employ a defense.**

Petitioner alleges his attorney failed to present a defense because he failed to call witnesses as requested by petitioner, specifically Attorney Mark Stanziano, Charlie Henderson, Steve Coffey, and Edna Randolph Boyer. Petitioner does not state what testimony Attorney Mark Stanziano would have offered.

Presumably, Charlie Henderson would have contradicted Randolph's testimony that Henderson drove petitioner and Randolph to Georgetown, Kentucky, to sell drugs to Steve Coffey. Steve Coffey would allegedly have testified that he had never met petitioner, let alone purchased drugs from him. Again, such testimony would have contradicted Randolph's testimony that he saw petitioner take drugs to Georgetown to sell to Coffey. Edna Randolph Boyer would allegedly have testified that Richard Randolph told her, two days prior to trial, that he did not want to testify against petitioner.

All of this alleged testimony would have been used to impeach the testimony of Richard Randolph. As the court has noted elsewhere in this opinion, however, Randolph was vigorously cross-examined at trial and his credibility impeached. [Section III., B., p. 17, *infra*]. Thus, counsel's alleged failure to call the witnesses requested by petitioner did not render the trial unfair or the result unreliable. *Austin v. Bell*, 126 F.3d 843, 847 (6th Cir. 1997); *Lockhart v. Fretwell*, 506 U.S. 364, 369 (1993).

**4. Failure to inform petitioner of the elements of the offense and potential sentence.**

Petitioner states that his attorney told him of the government's plea offer of 18 to 36 months, but advised against pleading guilty because the government's case was weak and all the evidence circumstantial. Petitioner alleges that counsel's failure to adequately explain the elements of the offense and the required proof of those elements, together with his failure to inform petitioner of the potential sentence he might be exposed to, renders petitioner's decision to go to trial unknowing and involuntary. According to petitioner, had he been properly advised of the government's evidence and the potential sentence, he would have pleaded guilty in spite of his innocence.

A defendant is entitled to the effective assistance of counsel in deciding whether to accept or reject the government's plea offer. *See, e.g., Turner v. State of Tennessee*, 858 F.2d 1201, 1205 (6th Cir. 1988) (the right to the effective assistance of counsel extends to the decision to reject a plea offer); *United States ex rel. Caruso v. Zelinsky*, 689 F.2d 435, 438 (3rd Cir. 1982) ("the decision to reject a plea bargain offer and plead not guilty is also a vitally important decision and a critical stage at which the right to effective assistance of counsel attaches"); *Beckham v. Wainwright*, 639 F.2d 262, 267 (5th Cir. 1981) (incompetent advice to withdraw a guilty plea and stand trial violates a defendant's right to effective assistance of counsel).

However, "there is a significant difference between the consequences emanating from a decision to reject a plea agreement and not plead guilty and the decision to enter a guilty plea." *Johnson v. Duckworth*, 793 F.2d 898, 901 (7th Cir. 1986). "The rejection of a plea

agreement, in most instances, will result in the defendant going to trial with all of the concomitant constitutional safeguards that are part and parcel of our judicial process." *Id.* at 900.

The government admits there was a proposed plea agreement, a copy of which is attached as an exhibit to the government's response. [Court File No. 7, Response to § 2255 motion, Exhibit 1]. The government denies that petitioner was offered a sentence of 18 to 36 months. As evidenced by the proposed plea agreement, petitioner was facing a term of imprisonment of up to 20 years in return for his plea of guilty to the drug conspiracy. [*Id.* at 1]. The plea agreement also provided, in relevant part, as follows:

> The Defendant acknowledges that he understands his case is governed by the Sentencing Guidelines and that any term of imprisonment imposed under the Guidelines is nonparolable. The Defendant acknowledges that no representations have been made to him by any representative of the United States regarding actual Sentencing Guidelines calculations in this case. The Defendant further acknowledges that he understands that any estimates or predictions made in this case by his attorney or any other person regarding application of the Sentencing Guidelines were merely predictions or estimates, and that the final decision as to application of the Sentencing Guidelines and his ultimate sentence will be made by the Court. The Defendant further acknowledges that he understands the Court will not be able to determine the Defendant's Sentencing Guideline range until it has received a presentence report from the United States Probation Office and any objections thereto from the parties. The Defendant understands that he will not be permitted to withdraw from this plea agreement nor withdraw his guilty plea based upon estimates anyone may have made as to his possible sentence.

[*Id.* at 2, ¶ 2]. The proposed plea agreement further provided that petitioner's sentence would be "based upon the entire scope of his criminal conduct, his criminal history, and pursuant to other factors and guidelines set forth in the Sentencing Guidelines." [*Id.* at 3, ¶ 6].

In addition, the record reflects that petitioner learned prior to trial that he would be sentenced as a career offender; in fact, that was the basis of his decision to not enter a plea of guilty. [Criminal Action No. 3:97-cr-154, Court File No. 177, Transcript of Proceedings, p. 4]. Apparently, petitioner's attorney had originally (and incorrectly) determined that petitioner's prior convictions would not count for purposes of sentencing as a career offender. Upon learning that the prior convictions would count, petitioner reconsidered his decision to plead guilty. Under the circumstances, petitioner's claim that his decision to stand trial was not voluntary based upon ineffective assistance of counsel is clearly without merit.

**5. Failure to move to suppress evidence.**

Petitioner alleges his attorney should have moved to suppress the ledger from the Limestone Street residence, the surveillance videotape from the Kentucky Rite-Aid, and the pharmaceutical drugs seized at the White Street residence. According to petitioner, failure to file a motion to suppress constituted ineffective assistance of counsel.

With respect to the ledger, petitioner claims it was not made available to the defense prior to trial, in violation of the request for discovery. There is nothing in the record, however, to suggest that the late receipt of the ledger hampered petitioner's attorney in his defense and thus there was no basis upon which counsel should have moved to suppress evidence of the ledger.

Petitioner alleges the videotape should have been suppressed because it had been spliced for training purposes by the Kentucky Rite-Aid security officers. The claim that the

videotape was altered goes to the weight to be accorded the evidence, not the admissibility of the evidence. Therefore, petitioner's attorney did not render ineffective assistance of counsel by failing to move to suppress the videotape.

Petitioner bases his challenge to the drugs on the fact that Agent Chris Hacker testified that the drugs were seized on February 10, 1996, although the search warrants were not issued until February 12, 1996. Agent Hacker testified that, on February 12, 1996, he assisted in collecting evidence after the execution of three search warrants. [Criminal Action No. 1:97-cr-154, Court File No. 178, Transcript of Proceedings, pp. 169-71]. When asked about a certain bag with writing on it, which contained items taken from the White Street residence, Agent Hacker testified it was his writing and noted that the date of recovery was "2-10-96." [*Id*. at 173]. Petitioner claims the drug were subject to suppression based upon this testimony.

Agent Hacker specifically testified, however, that he collected the evidence after the execution of the search warrant and petitioner's arrest. [*Id*. at 171]. In addition, Douglas Ralph Nelson, a detective with the Somerset Police Department, testified that he participated in the execution of three search warrants on February 12, 1996, including that of the White Street residence. [Criminal Action No. 1:97-cr-154, Court File No. 178, Transcript of Proceedings, pp. 137-38].

Agent Hacker's error, whether in his testimony or in his writing on the evidence bag, is not material. Accordingly, any motion to suppress the evidence of the drugs seized at the

13

White Street residence would have been frivolous. Petitioner has failed to state a claim of ineffective assistance of counsel in this regard.

**6. Failure to move to dismiss based upon a speedy trial violation.**

Petitioner alleges his rights under the Speedy Trial Act, 18 U.S.C. § 3161, were violated and thus his attorney should have moved to dismiss the case on that basis. According to petitioner, his trial was continued twice. All trial continuances were the result of motions to continue filed by the defendants, however, and the court each time found that the time between the old and new trial dates was excludable under the Speedy Trial Act. [*Id.*, Court File Nos. 88 and 113].

Petitioner also alleges that, although he was brought before the court pursuant to a writ of habeas corpus ad prosequendum, he was not given sufficient notice to contest the legality of his delivery, as required by 18 U.S.C. § 3161(j). Violation of the notice requirement of § 3161(j), however, is not a basis for dismissal of a criminal case. *See, e.g., United States v. Mercedes*, 287 F.3d 47, 53 n.7 (7th Cir. 2002) ("dismissal of the indictment is not an authorized remedy for a violation of § 3161(j)"). Accordingly, any motion to dismiss based upon alleged speedy trial violations would have been frivolous, and petitioner's attorney did not render ineffective assistance in failing to make such a motion.

Based upon the foregoing, petitioner has failed to demonstrate ineffective assistance of counsel under the standard established by the Supreme Court in *Strickland*.

## B. Brady and Giglio Claims

Petitioner alleges the government withheld evidence, in violation of its obligations under *Brady v. Maryland*, 373 U.S. 83 (1963), and *Giglio v. United States*, 405 U.S. 150 (1972). In *Brady*, the Supreme Court held that "suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." 373 U.S. at 86. Impeachment evidence as well as exculpatory evidence "falls within the *Brady* rule." *United States v. Bagley*, 473 U.S. 667, 676 (1985). "Favorable evidence is material, and constitutional error results from its suppression by the government, 'if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceedings would have been different.'" *Kyles v. Whitley*, 514 U.S. 419, 433-34 (1995) (quoting *Bagley*, 473 U.S. at 682).

In *Giglio*, the Supreme Court considered a situation where the prosecution withheld from the jury the fact that it had promised a key witness that he would not be prosecuted for his part in a crime if he testified against his companion. Because the witness's credibility was a key issue, the Court found that the government's conduct violated due process and the defendant was entitled to a new trial. 405 U.S. at 154-55. *Giglio*, along with *Brady* and *Bagley* convey the doctrine "that it is fundamentally unfair for the government to achieve a conviction through the concealment of evidence which undermines the strength of the

government's case against a defendant." *United States v. Presser*, 844 F.2d 1275, 1282-83 (6th Cir. 1988).

Petitioner's *Brady/Giglio* claims concern, first, the testimony of petitioner's brother-in-law, Richard Randolph, who petitioner alleges has recanted his testimony. Randolph testified at trial that petitioner had bragged to him about robbing a Tennessee pharmacy with co-defendant Burton; Randolph testified that, at the time, petitioner showed him a black bag with several bottles of pills in it. [Criminal Action No. 3:97-cr-154, Court File No. 178, Transcript of Proceedings, pp. 13-14].

Randolph also testified that several months later, he, Randolph, along with petitioner's teen-aged son Bret burglarized a pharmacy in Somerset, Kentucky, and stole drugs. [*Id*. at 15-17]. According to Randolph, he and Bret Crozier took the drugs back to petitioner's house and petitioner took some of the drugs and sold them. [*Id*. at 17-20].

Petitioner has now submitted an unsworn "Affidavit" purportedly signed by Richard Randolph, in which he states as follows:

> I was coerced and pressured by local and Federal authorities to testify false statements against David L. Crozier and Charles W. Burton during a Federal trial held in the Eastern District Of Tennessee at Knoxville on or about April 6, 1999. The statements I made during said trial were untrue[;] however I made those statements due to threats made against me and my family by local and Federal authorities.

[Court File No. 5, Memorandum of Law in Support of Motion to Vacate Sentence, Exhibit A, Affidavit].

Petitioner has also submitted a letter purportedly from Michael Phelps, who states that while working as the Family Services Office Supervisor for the Department for Social Services in Somerset, Kentucky, he was called to the Operation Hope emergency shelter to look at a young man the police had brought in. According to Phelps, it was Bret Crozier and he appeared battered, with a broken nose and contusions on his face. Bret Crozier told Phelps that the city police came to his house looking for his father, placed Bret in handcuffs and manacles, and one officer pulled his feet out from under him, causing Bret to fall on his face. [*Id.*, Exhibit B].

According to petitioner, these documents are evidence of the government's intent to get petitioner off the street at any cost, including coercing Randolph to lie at trial. Petitioner argues that, not only did the prosecution fail to provide the exculpatory evidence that Randolph's testimony was coerced, the prosecution specifically directed Randolph to suppress this evidence during his testimony.

There is nothing in the record to support petitioner's allegations, other than the unsworn "affidavit" purportedly signed by Randolph. Randolph was subjected to a rigorous cross-examination at trial; the inconsistencies in his testimony were highlighted, his credibility was impeached, and his motive to fabricate was clearly demonstrated. Randolph's alleged claim now that he testified falsely fails to carry any weight with this court. The court specifically notes that, during his direct testimony at trial, Randolph testified that he had not been threatened in any way by anyone with the government. [Criminal Action No. 3:97-cr-154, Court File No. 178, Transcript of Proceedings, p. 10]. Accordingly, the court finds that

17

petitioner's conviction was not achieved through the concealment of evidence by the government. Petitioner is not entitled to relief based upon his *Brady* and *Giglio* claims.

## C. Career Offender

Petitioner alleges the court erred in sentencing him as a career offender. He concedes that he met the definition of a career offender, as set forth in U.S.S.G. § 4B1.1. Petitioner claims, however, that he has sought to reopen a conviction from the Pulaski County Circuit Court in order to expunge that conviction and, for that reason, he asks the court to stay these proceedings until he has done so. There is no basis for the court to stay proceedings as requested by petitioner, nor is there any other basis for granting relief on this claim. *See, e.g., Smith v. United States*, 262 F.3d 537 (6th Cir. 2001) (defendant could not use § 2255 to vacate federal sentence on ground that state convictions used to enhance federal sentence were unconstitutional).

IV. Conclusion

Petitioner is not entitled to relief under § 2255 and his motion to vacate, set aside or correct sentence will be **DENIED**. This action will be **DISMISSED**. In addition to the above, this court **CERTIFIES** that any appeal from this action would not be taken in good faith and would be totally frivolous. Therefore, this court will **DENY** petitioner leave to

proceed *in forma pauperis* on appeal. *See* Rule 24 of the Federal Rules of Appellate Procedure. Petitioner having failed to make a substantial showing of the denial of a constitutional right, a certificate of appealability **SHALL NOT ISSUE**. 28 U.S.C. § 2253; Rule 22(b) of the Federal Rules of Appellate Procedure.

**AN APPROPRIATE ORDER WILL ENTER.**

                                                             s/ James H. Jarvis
                                                     United States District Judge